|  |  |  |
|---|---|---|
| PATRICIA HUGHES, | ) | |
| | ) | |
| Plaintiff, | ) | Case. No. 10 C 4912 |
| v. | ) | |
| | ) | Magistrate Judge |
| Michael J. Astrue, | ) | Arlander Keys |
| Commissioner of Social | ) | |
| Security | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Patricia Hughes asks this Court to enter summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, reversing or remanding the decision of the Commissioner of the Social Security Administration to deny her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner filed a cross-motion for summary judgment, asking the Court to affirm his final determination. For the reasons explained below, Ms. Hughes' motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

### Procedural History

On February 9, 2007, Ms. Hughes filed concurrent applications for DIB and SSI. Record at 132. She alleged that her disability began on August 28, 2006. Record at 132. Ms.

Hughes claims were initially denied on May 16, 2007. Record at 59-60. Ms. Hughes requested reconsideration of her claims on May 31, 2007. Record at 81-82. On June 15, 2007, the Regional Commissioner affirmed the denial. Record at 83-90. Ms. Hughes requested a hearing before an Administrative Law Judge ("ALJ") on December 3, 2007. Record at 93-94.

On June 9, 2009, Ms. Hughes presented her disability claims before ALJ Sheldon P. Zisook in Chicago, Illinois. Record at 13. On September 30, 2009, ALJ Zisook issued an unfavorable decision. The ALJ found that Ms. Hughes was not disabled as defined in the Social Security Act. Record at 75. Ms. Hughes filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council on October 9, 2009. Record at 9. On June 30 2010, the Appeals Council denied the request for review. Record at 1. The ALJ's June 9, 2009 decision thus became the Commissioner's final administrative determination. On August 10, 2010, Ms. Hughes filed a complaint in the United States District Court for the Northern District of Illinois, seeking review of that final determination. The parties consented to proceed before a United States Magistrate Judge, and, on November 2, 2010, the case was reassigned to this Court. Thereafter, the parties filed cross motions for summary judgment.

## Factual Background

A.  Hearing of June 9, 2009

At the hearing on June 9, 2009, the ALJ heard testimonial
evidence from Ms. Hughes. Record at 16-58.  Ms. Hughes, who was
53-years-old at the time of the hearing, testified that she had
graduated from college and had obtained a bachelor's degree.
Record at 16, 17.  Ms. Hughes testified that she last worked
full-time for pay in August of 2006.  Record at 17.  She
testified that, at the time of the hearing, her sole means of
income was food stamps.  Record at 17.

Ms. Hughes also provided testimony regarding her past work
history.  Record at 17-25.  She testified that her last full-time
position was working as a night audit worker at a hotel.  Record
at 18.  Her testimony was that this position required lifting
full coffee pots, paperwork, towels and bedding.  Record at 25.
She testified that this lifting caused her pain in the neck,
shoulders, and back.  Record at 25.  Ms. Hughes further testified
that the pain occasionally brought her near the point of tears.
Record at 25.

Ms. Hughes also testified that she held many previous jobs
which entailed clerical work or data entry.  Record at 19.  She
testified that her typical duties included: answering phones,
opening mail, sending mail, working on computers, entering data,

word processing and filing. Record at 19. Her testimony was that the clerical and data entry positions required lifting of paperwork, mail and files. Record at 19. Ms. Hughes testified that the data entry positions she held were the least physically challenging. Record at 53. Ms. Hughes also testified that she believed she could not perform a data entry job because sitting in a contracted position at a desk would cause her pain in her shoulders. Record at 53.

At the hearing, Ms. Hughes proffered detailed testimony regarding her physical capabilities. Record at 25-57. Ms. Hughes' testimony detailed three main health concerns: bilateral adhesive capsulitis of the shoulder joints; COPD or bronchiectasis; and hearing loss. Record at 27, 44, 49. Ms. Hughes testified that she had no range of motion and limited strength in her upper body due to a condition called bilateral adhesive capsulitis. Record at 26. She also testified that it took two years to regain range of motion in one shoulder and three years to regain range of motion in the other shoulder. Record at 27. Ms. Hughes testified that this condition seriously limited her upper body strength, and that it caused her to only be able to lift two-and-a-half pounds throughout the day. Record at 36. Ms. Hughes testified that her bilateral adhesive capsulitis affected other areas of her physical capabilities as

well. Record at 36. She testified that this condition also limited her ability to sit for long periods of time. Record at 36. Specifically, she testified that sitting for long periods of time caused extreme muscle fatigue in her shoulders as well as muscle spasms. Record at 36.

Ms. Hughes testified that her second most serious health condition was her COPD or chronic bronchitis. Record at 44-46. She testified that she was prone to upper respiratory infections that reoccurred between one and five times annually. Record at 44. Ms. Hughes provided testimony that she visited Cook County Hospital for her most recent attack in 2008. Record at 44. She testified that her COPD or chronic bronchitis caused her to feel weary, and it affected her work. Record at 46.

Ms. Hughes testified that, in addition to the above-mentioned ailments, she suffered from hearing loss in her right ear. Record at 48-49. She testified that she has difficulty hearing when there are many competing conversations and sounds. Record at 48-49. In the hearing, Ms. Hughes was asked if she had difficulty hearing the questions she was being asked by the ALJ or the attorney. Record at 48. She testified that she did not. Record at 48. She testified that she did not seek medical treatment for any of the above-mentioned conditions between 2003 and 2007 because she did not have health insurance or an ability

to pay on her own. Record at 33. Ms. Hughes testified that, in 2007, after she had applied for Social Security, someone at the Social Security office mentioned that she could receive free medical care at Stroger Hospital. Record at 34.

Ms. Hughes provided testimony relating to her activities of daily living. Record at 35-36, 46-47. She testified that she purchased her own groceries and carried them home on the bus. Record at 47. She estimated that the grocery bag she carried weighed between eight and ten pounds. Record at 47. Additionally, she testified that she would not be able to carry eight to ten pounds consistently for an eight-hour workday. Record at 47. Ms. Hughes testified that she was able to perform daily functions like cleaning, doing laundry, buying groceries, shopping etc. Record at 47. She testified that she modified her daily activities so that she would not have to do any heavy lifting. Record at 35, 47. For example, she testified that, when she did her laundry, she used a smaller bag instead of a laundry basket. Record at 35.

B.   Medical Evidence

In addition to the testimony of Ms. Hughes, the ALJ considered medical evidence from the relevant time period; this evidence included medical records relating to Ms. Hughes'

impairments, as well as disability and consultative examination reports. Record at 234-488.

1.  Disability Reports

Ms. Hughes submitted several disability reports to support her claims of physical disability. Record at 200-218. In these reports, Ms. Hughes complained of problems with her shoulders, lung problems, and hearing loss. Record at 163. Her specific complaints included: (1) trouble lifting anything heavy; (2) severe spasms in her neck; (3) hearing loss; (4) trouble breathing; (5) severe sinus infections and sinus headaches; (6) migraine headaches; (7) shortness of breath; (8) dizziness when breathing polluted air; (9) trouble breathing depending on the weather; and (10) minor odors causing shortness of breath. Record at 163, 186, 187, 188, 190-97, 204, 213.

In the disability reports, Ms. Hughes also provided information about her daily living habits. Record at 192-97. She indicated that she could perform most household chores and personal hygiene tasks by modifying them so that she would not have to perform heavy lifting. Record at 192-97. Ms. Hughes indicated that she needed assistance performing tasks like opening jar lids. Record at 192. When Ms. Hughes had to purchase groceries she carried a ten-pound bag of groceries on public transportation. Record at 193.

## 2. Bronchiectasis/COPD

Ms. Hughes claims that she became unable to work because of disabling conditions that manifested on August 28, 2006. Record at 163. Ms. Hughes and her attorney submitted medical records detailing three different conditions: chronic bronchitis or bronchiectasis; bilateral adhesive capsulitis; and hearing loss. Record at 234-488.

Ms. Hughes' medical records indicate that she received treatment for bronchitis from Providence Medical Group in Portland, Oregon, starting in 2002. Record at 235. On August 7, 2002, Dr. Wells diagnosed Ms. Hughes with allergies, causing a sinus infection, and, as a secondary diagnosis, bronchitis, causing an asthma-like reaction. Record at 235, 365, 378. On November 6, 2002, Dr. Morganroth treated Ms. Hughes for her nasal congestion, and he reported that Ms. Hughes had a clear chest x-ray and sinus CT scan. Record at 324-26. Dr. Morganroth ordered additional testing to determine whether Ms. Hughes had asthma. Record at 326. On October 2, 2002, Ms. Hughes underwent a pulmonary function test. Record at 327. Dr. Beecher reported that the test indicated a mild decrease in forced vital capacity, but that the patient was not able to complete the test, so the results might be unreliable. Record at 327. The report indicated that Ms. Hughes had a four-pack-a-year history of

8

smoking, which she discontinued in 1978.  Record at 327.  Dr.
Beecher diagnosed Ms. Hughes with allergies and asthma.  Record
at 326.  There was a gap in treatment between 2002 and 2007, and
on November 14, 2007, Dr. Tulaimat, at Cook County Hospital's
Pulmonary Clinic, diagnosed Ms. Hughes with bronchiectasis.
Record at 401, 415.

On January 15, 2008, Ms. Hughes was admitted to Cook County
Hospital's Emergency Room, and she was treated for COPD with
Azithromycin.  Record at 474-75.  On January 26, 2008, she
returned to the Cook County Emergency Room and reported that the
round of antibiotics was ineffective.  Record at 469.

On May 27, 2008, Dr. Robert Cohen diagnosed Ms. Hughes with
mild bronchiectasis.  Record at 484-87.  The report indicated
that Ms. Hughes was asymptomatic, with no treatment other than
over-the-counter nasal spray.  Record at 487.  Dr. Cohen also
reported that Ms. Hughes had a very difficult time dealing with
the diagnosis.  Record at 487.

3.   Bilateral Adhesive Capsulitis

On August 7, 2002, Dr. Wells also diagnosed Ms. Hughes with
adhesive capsulitis, commonly known as frozen shoulder.  Record
at 388.  Ms. Hughes was referred for physical therapy, and, on
October 23, 2002, she began attending physical therapy at
Providence Rehabilitation Services in Portland, Oregon.  Record

at 252-54, 388. She continued to receive physical therapy treatments on a weekly basis until her discharge on March 11, 2003. Record at 263.

On November 14, 2007, Dr. Tulaimat, at Cook County Hospital's Pulmonary Clinic, diagnosed her with bilateral adhesive capsulitis not affecting her range of motion but causing weakness in the left shoulder. Record at 418.

On November 28, 2007, Dr. Brandis treated Ms. Hughes for bilateral adhesive capsulitis at Cook County Hospital. Record at 476. Dr. Brandis conducted a physical exam and the reported results were that Ms. Hughes had full range of motion in her shoulder joints and that she had muscle strength decrease on the left side. Record at 476. She was referred to the musculoskeletal clinic. Record at 476.

On January 7, 2008, Dr. Clar completed a Return to Work/School Verification for Ms. Hughes at the Ambulatory Community Health Network and Bureau. Record at 427. Dr. Clar reported that Ms. Hughes could not lift more than two-and-a-half pounds and could not do continuous filing work for more than ten minutes without a break. Record at 427. Dr. Clar determined that Ms. Hughes could return to work "ASAP." Record at 427.

On May 14, 2009, Kathy Jones, Ms. Hughes Physical Therapist at Cook County Hospital's Occupational Therapy Outpatient Clinic,

authored a final report on Ms. Hughes condition. Record at 482.
At the time of this report, Ms. Hughes indicated that the level
of pain she was in was a zero on a scale of one to ten. Record
at 481. Ms. Jones reported that Ms. Hughes stated she lived in
an apartment on a third floor with stairs. Record at 481. Ms.
Jones also reported that Ms. Hughes "had a slight scapular
winging at the right scapular." Record at 482. The tests Ms.
Jones conducted showed that Ms. Hughes had decreased range of
motion and decreased strength in both shoulders. Record at 482.
During this exam, Ms. Hughes reported that the problem in the
right shoulder began on May 2, 2002, and the problem with the
left shoulder began on August 15, 2002. Record at 484.

    4.   <u>Hearing Loss</u>

On October 12, 1992, the Portland State Audiology Clinic
diagnosed Ms. Hughes with moderate hearing loss in the lower
frequencies in her right ear. Record at 242-44. The supervising
audiologist suggested that she try amplification in her right
ear, though there are no other records to suggest that she
followed this advice. Record at 242.

On August 15, 2007, Ms. Hughes saw Dr. Newland for a follow-up
audiological evaluation at the Ambulatory and Community Health
Care Clinic of Cook County. Record at 434, 467. Dr. Newland
reported that Ms. Hughes displayed severe hearing loss in certain

ranges. Record at 434. The record indicated that Ms. Hughes, "may have difficultly discerning the localizing a sound source especially with high background noise levels." Record at 434. Dr. Newland recommended that Ms. Hughes consider amplification, but according to the progress notes, she did not want to consider that option at that time. Record at 434.

    5.   <u>Physical Consultative Examination & RFC Test Results</u>

On May 2, 2007, Ms. Hughes saw Dr. Villaneuva, who conducted an initial Internal Medical Consultative Examination ("CE") for the Bureau of Disability Determination Services. Record at 401. During this exam, Dr. Villaneuva reported that Ms. Hughes stated that there was a gap in treatment between 2002 and the current exam. Record at 401. Ms. Hughes also told Dr. Villaneuva that she could lift or carry less than ten pounds due to frozen shoulders, and she complained of pain in both shoulders. Record at 402. Ms. Hughes indicated that she had recovered full range of motion in both shoulders. Record at 402. Dr. Villaneuva performed a musculoskeletal system review on Ms. Hughes and the results were normal for all joints. Record at 405, 410. Ms. Hughes complained of frequent bronchitis and sinus problems, as well as, hearing loss in the right ear. Record at 401-02.

On June 9, 2009, the ALJ ordered a post hearing physical consultative exam ("CE") and a Residual Functional Capacity Exam

("RFC"). Record at 54, 57. Dr. Elmes, an orthopedic specialist, conducted both of these exams. Record at 436, 422. On July 13, 2009, Dr. Elmes conducted an Orthopedic CE for the Bureau of Disability Determination services. Record at 436. Dr. Elmes reported that Ms. Hughes complained of bilateral shoulder pain and neck pain both starting in 2002. Record at 436. Dr. Elmes questioned Ms. Hughes about the pain she experienced in her shoulders. Record at 437. Ms. Hughes indicated that she was experiencing a pain level of three on a scale of one to ten with ten being the worst. Record at 437. Ms. Hughes reported that, on the best day, the pain was a two and, on the worst day, it was a six. Record at 437. She complained of the same levels of neck pain. Record at 437. Dr. Elmes had X-rays taken of Ms. Hughes' shoulders at Chicago Consulting Physicians on the same date. Record at 437. He reported that her joints appeared normal, but noted evidence of degenerative rotator cuff disease in both shoulders. Record at 438. Chicago Consulting Physicians performed a musculoskeletal system review as part of the CE. Record at 441-45. The results of this test came back normal. Record at 441-45. Part of this review was a physical strength test. Record at 441-45. Dr. Elmes interpreted the results of this test, and he determined that Ms. Hughes displayed high upper and lower extremity strength, as well as grip strength. Record

at 438.  Dr. Elmes also determined that Ms. Hughes' range of motion in her shoulders was normal, with a slight decrease in internal rotation.  Record at 439.  He also determined that Ms. Hughes', "range of motion of the neck was diminished in all directions."  Record at 439.  Dr. Elmes concluded that Ms. Hughes had: (1) nonspecific right and left shoulder pain; (2) mild bilateral adhesive capsulitis with slight decrease in internal rotation; (3) nonspecific neck pain; (4) chronic degenerative rotator cuff disease; (5) COPD; (6) a discolored skin graft on her right ear; and (7) decreased vision.  Record at 439.

On July 13, 2009, Dr. Elmes completed the Physical Residual Functional Capacity assessment.  Record at 446.  The purpose of this exam was to determine Ms. Hughes' ability with regard to work-related activities.  Record at 450.  The RFC indicated that Ms. Hughes could occasionally lift or carry up to ten pounds. Record at 446.  Occasionally is defined as very little up to one-third of the time.  Record at 446.  Dr. Elmes also concluded that Ms. Hughes could sit for five-hours, stand for two-hours and walk for two-hours in an eight-hour workday.  Record at 447.  Dr. Elmes concluded that Ms. Hughes also had impairments that affected her hearing.  Record at 449.  He reported that this impairment did not affect Ms. Hughes' ability to hear and understand simple oral instructions, and that Ms. Hughes was

capable of using a telephone to communicate.  Record at 449.  He concluded that she would be able to tolerate the noise level of an office.  Record at 450.

C.   Occupational Evidence

The record before the ALJ also included a work history, in which Ms. Hughes reported working, within the past 15 years, as a clerical worker, an exercise instructor, a substitute teacher, a special education assistant and a property manager.  Record at 182-91.  According to the report, her most recent position before alleging disability was working the night shift at a hotel. Record at 182.  Ms. Hughes held this position for less than one year.  Record at 182.  This position entailed checking guests in and out, preparing hotel audit paperwork, making coffee, taking calls, and providing towels, blankets and pillows to guests. This position did not require lifting over ten pounds.  Record at 187.  Ms. Hughes held numerous data entry and clerical positions for ten of the fifteen years prior to her cessation of working. Record at 182.  She indicated that, as a clerical worker, she was required frequently to lift objects weighing less than ten pounds - including boxes of envelopes, packages of copy paper, batches of data entry, boxes of files, boxes of brochures, cases of wine, and mail tubs.  Record at 183.

D.    The ALJ's Decision

On September 30, 2009, the ALJ issued his decision, finding that Ms. Hughes was not under a disability according to sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act ("SSA"). Record at 66. In making this determination, the ALJ applied the five-step sequential analysis that the Social Security Administration employs to determine if an adult is disabled. 20 C.F.R. § 404.1520 (2003). Record at 69.

At step one, the ALJ found that Ms. Hughes had not engaged in any substantial gainful activity ("SGA") since the alleged onset date of August 28, 2006. Record at 68.

The ALJ then determined, at step two, that Ms. Hughes had severe impairments causing more than minimal functional limitations. Record at 68. These severe impairments were mild bilateral adhesive capsulitis of the shoulders and COPD. Record at 68.

Next, at step three, the ALJ determined that Ms. Hughes did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Social Security Regulations. 20 C.F.R. 404 Subpart P, Appendix 1 (2008); Record at 68. In making this determination, the ALJ evaluated listing 1.02B (major dysfunction of a joint(s)), listing 3.02A (chronic pulmonary insufficiency), and listing 3.03

16

(asthma). *Id.*; Record at 68-9. In his decision, the ALJ noted that Ms. Hughes did not meet listing 1.02B because she was able to independently initiate and sustain daily activities that required fine and gross manipulation. Record at 69. The ALJ referenced Ms. Hughes' testimony and disability reports which indicated that she was able to perform household chores. Record at 69. In reference to listings 3.02A and 3.03, the ALJ determined, based on the pulmonary function reports, that Ms. Hughes' lung functioning capacity was not low enough to meet the listing criteria for 3.02A, and that she did not have frequent enough asthma attacks to meet listing 3.03. Record at 69. The ALJ then determined Ms. Hughes' Residual Functional Capacity ("RFC"). Record at 69-75.

The ALJ ruled that Ms. Hughes had the following RFC: "Ms. Hughes can lift/carry up to ten pounds; sit for six hours and stand or walk for six hours in an eight hour workday; and that she should avoid excessive expose to lung irritants." Record at 69. The ALJ reviewed Ms. Hughes' symptoms under a two step process consistent with 20 C.F.R. 416.929. 20 C.F.R. 416.927; 20 C.F.R. 404.1529; SSRs 96-4p. At the first step, the ALJ determined that there was an underlying medically determinable physical or mental impairment that could reasonably be shown by medically acceptable clinical and laboratory diagnostic

17

techniques that could reasonably be expected to produce Ms. Hughes' pain or other symptoms.  Record at 70, 20 C.F.R. 416.929.

Next, the ALJ determined that the intensity, persistence and limiting effects of Ms. Hughes' symptoms were not credible to the extent that they were not substantiated by the objective medical evidence.  Record at 69.  The ALJ further determined that the intensity, persistence and limiting effects of Ms. Hughes' symptoms were not credible based on an assessment of the entire case record and her RFC.  Record at 69.  The ALJ first considered Ms. Hughes' statements regarding her medical conditions, treatment and physical abilities.  Record at 69-70.  The ALJ then addressed the lack of a longitudinal medical record and the lack of aggressive treatment.  Record at 70-71.  The ALJ next analyzed the credibility of each of Ms. Hughes' reported physical impairments and symptoms by reviewing her testimony and work history and the objective medical evidence.  Record at 71-74. Lastly, the ALJ considered the credibility of the medical opinion evidence in light of the case record.  Record at 74-75.

The ALJ first referenced Ms. Hughes' testimony regarding her physical impairments.  Record at 69-70.  Ms. Hughes testified to having frozen shoulders and no range of movement in her arms. Record at 69.  She attended physical therapy in 2002 and 2003 to address this condition, and she testified that it took her two to

18

three years to regain range of motion. Record at 69. Ms. Hughes did not seek treatment for her medical conditions between 2003 and 2007. Record at 69. She testified that this was because she had no health insurance and no other ability to pay. Record at 69. Ms. Hughes claimed that she learned about free healthcare at Stroger Hospital from an employee at SSA when the SSA employee noted that she had very few medical records. Record at 69. She then recommenced treatment of her bilateral adhesive capsulitis and her bronchiectasis or COPD. Record at 69.

Next, the ALJ reviewed Ms. Hughes' testimony regarding her physical abilities. Record at 69-70. Ms. Hughes claimed to not be able to lift a gallon of milk because of her shoulder issues. Record at 69. She also claimed that she would have trouble sitting at a desk because she is prone to muscle spasms. Record at 69. Ms. Hughes testified to her pain management efforts. Record at 69. She claimed that she was given lidocaine patches but she discontinued use after she had numbing sensations as a side effect. Record at 69. Her current claimed method of pain management for her shoulders was ice and rest. Record at 69. Ms. Hughes also testified that she is unable to work because of her COPD. Record at 69. She testified that she received treatment for a COPD flare up at Stroger hospital in 2008, but that the antibiotics did not work. Record at 69. Ms. Hughes

19

also testified that her hearing loss could interfere with aspects of past jobs. Record at 70.

The ALJ then cited Ms. Hughes' testimony that her daily activities included light household chores like vacuuming and laundry. Record at 69. The ALJ cited Ms. Hughes' testimony that she could buy her own groceries and noted that, by Ms. Hughes' testimony, this task entailed riding public transportation to and from the store and carrying a bag of groceries weighing between eight and ten pounds all the way home. Record at 69. Ms. Hughes also testified that she could not carry eight to ten pounds during an eight hour work day or even a third of the work day. Record at 69-70.

Next, the ALJ determined that the lack of a longitudinal medical records and aggressive treatment indicated that Ms. Hughes' statements were less credible because they were inconsistent with the level of complaints. Record at 70, SSR 96-7. The ALJ determined that Ms. Hughes' failure to seek treatment between 2003 and 2007 cast doubt on her credibility. Record at 70. The ALJ supported this contention by reasoning that the lack of insurance would not have prevented her from seeking emergency room treatment. Record at 70. Additionally, the ALJ found that Ms. Hughes sought treatment only sporadically, even after she allegedly learned that she could obtain treatment at Stroger

Hospital.  Record at 70.  Ultimately, the ALJ ruled that Ms.
Hughes' sporadic pursuit of treatment was inconsistent with her
claims of disabling impairments.  Record at 70.  The ALJ also
found that Ms. Hughes' claimed need of isolation and inactivity
was not substantiated by the evidence and seemed to be more a
preference than a medically induced limitation.  Record at 71.
Ms. Hughes testified that she was unable to perform work activity
at any level, yet none of her examining physicians' assessments
support this claim.  Record at 21.

The ALJ then found that, in addition to the lack of medical
records, the medical evidence of record did not support the
extent of Ms. Hughes' alleged limitations.  Record at 71-74.  The
ALJ addressed all of Ms. Hughes' medical impairments including:
hearing loss, bilateral adhesive capsulitis and COPD or
bronchiectasis.  Record at 71-74.

The ALJ ruled that Ms. Hughes' claim that she could not work
due to hearing loss was not credible because: Ms. Hughes refused
treatment and failed to attend a recommended follow up; Ms.
Hughes took public transportation regularly without any stated
difficulty with the background noise; Ms. Hughes did not testify
to any difficulty performing prior jobs secondary to hearing
loss; and Ms. Hughes' hearing actually improved from the first
audiology report in 1992 to the second audiology exam in 2007.

Record at 71. Additionally, the ALJ reasoned that Ms. Hughes'
hearing loss would not interfere with her ability to perform work
related activities because she worked successfully until August
2006, the alleged onset date, despite the fact that her hearing
condition was first documented in 1992. Record at 71. The ALJ
also ruled that Ms. Hughes' hearing condition was not severe.
Record at 71.

Next, the ALJ ruled that Ms. Hughes' testimony regarding her
shoulder impairment was not credible. Record at 71-72. The ALJ
cited Ms. Hughes' testimony that her chief problem was her
shoulders, which prevent her from carrying eight to ten pounds
for a third of a work day. Record at 71. The ALJ also cited Ms
Hughes' testimony that she could not sit and perform desk work
because of muscle spasms in her shoulders. Record at 71. The
ALJ then noted that the medical evidence of record demonstrated
that Ms. Hughes was diagnosed with adhesive capsulitis in 2002,
for which she received a year of physical therapy. Record at 71.
The ALJ found that, since 2002, Ms. Hughes had performed various
clerical and office work position until August 28, 2006, her
alleged onset date. Record at 71. The ALJ referenced the May 2,
2007 internal medicine consultative examination, which determined
that Ms. Hughes had full range of motion in both of her
shoulders, intact strength, reflexes and sensation. Record at

71. During this examination, Ms. Hughes told the examiner that she had regained full range of motion but could not lift or carry over ten pounds. Record at 71. In further evidence for his findings, the ALJ outlined all of Ms. Hughes' medical records, since treatment recommenced in 2007, regarding her claimed shoulder impairment. Record at 71-72. Outpatient notes dated January 7, 2008 show Ms. Hughes was diagnosed with past adhesive capsulitis of the shoulders, and she was restricted to not lifting more than 2.5 pounds and no continuous filing type work for more than ten minutes without a break. Record at 72. However, the ALJ found that the doctor's notations demonstrated that Ms. Hughes had full range of motion with intact strength and sensation. Record at 72. The ALJ then reviewed the post-hearing orthopedic consultative exam that Ms. Hughes had with Dr. Elmes. Record at 72. The ALJ found that, during this examination, Ms. Hughes claimed that she had suffered shoulder and neck pain since 2002. Record at 72. The ALJ outlined the details of Dr. Elmes' physical exam and the main findings were: fine motor and gross coordination, intact grip strength, intact upper extremity strength, some decreased range of motion in her spine and neck and the x ray showed evidence of degenerative rotator cuff disease. Record at 72. The ALJ additionally referenced Dr.

Elmes' diagnosis of Ms. Hughes with non-specific right and left shoulder pain and mild bilateral adhesive capsulitis.

The ALJ then evaluated Ms. Hughes' testimony regarding her daily activities. Record at 72. The ALJ referenced Ms. Hughes' testimony that she was able to perform normal household chores like laundry, taking out garbage and grocery shopping. Record at 72. The ALJ reasoned that Ms. Hughes attempted to downplay the fact that she carries eight to ten pound bags of groceries on the train with her statements that she could not lift that amount for a third of a work day. Record at 72. The ALJ then ruled that Ms. Hughes' daily activities were not consistent with the level of pain she alleged, regardless of how much time she performed in each individual activity, and that she was not credible regarding her bilateral shoulder pain and muscle spasms. Record at 72-73. The ALJ also held that the RFC provided for Ms. Hughes' shoulder pain and neck pain by limiting her to lifting and carrying ten pounds. Record at 73.

The ALJ next evaluated Ms. Hughes' physical impairment of COPD or bronchiectasis. Record at 73-74. The ALJ determined that Ms. Hughes' RFC more than accommodated this impairment by precluding excessive exposure to lung irritants. Record at 73. The ALJ cited Ms. Hughes' testimony and objective medical records to support his findings. Record at 73. The ALJ also noted that

24

Ms. Hughes was a smoker, and that her smoking undermined her allegations of disabling lung disease. Record at 73. The ALJ noted medical records from May 2007, January 2008 and May 2008 all demonstrated that Ms. Hughes had clear lungs bilaterally. Record at 73. The ALJ also noted that Ms. Hughes was diagnosed with mild bronchiectasis on May 27, 2008, and the physician's notes indicated that she was asymptomatic, with no treatment other than over the counter nasal spray. Record at 74. Based on the objective medical evidence, the ALJ determined that limiting Ms. Hughes' exposure to lung irritants was sufficient. Record at 73-74.

Next, the ALJ evaluated the medical opinion testimony of the state agency expert medical consultant, Ms. Hughes' treating source and Dr. Elmes, the consultative orthopedic physician. Record at 74. The ALJ determined that the state agency medical expert consultant who determined that Ms. Hughes did not have a severe impairment was incorrect based on evidence obtained at the hearing. Record at 74. The ALJ also cited the treating source's report from January 7, 2008 which indicated that Ms. Hughes could not lift more than 2.5 pounds and could perform no continuous filing type work for more than ten minutes without a break. Record at 74. The ALJ did not find these work restrictions credible because, in the same report, the treating source noted

that Ms. Hughes had full range of motion with intact strength and sensation. Record at 74. The ALJ also noted that Ms. Hughes refused medications and did not seek treatment for the following fifteen months. Record at 74.

The ALJ then reviewed the July 13, 2009 physical residual functional capacity assessment conducted by Dr. Elmes. The ALJ noted that Dr. Elmes found that Ms. Hughes could lift or carry up to ten pounds occasionally, could stand walk for two hours but only for thirty minutes at a time, and she could sit for five hours but only for thirty minutes at a time. Record at 74. She could occasionally reach overhead, climb, balance, stoop, kneel or crawl. Record at 74. She could also occasionally perform work involving: unprotected heights, moving mechanical parts, extreme heat, vibrations, and office noise; and operate motor vehicles. Record at 74. She could never perform work involving humidity and wetness, pulmonary irritants, and extreme cold. Record at 74. The ALJ determined that Dr. Elmes' conclusions that Ms. Hughes could only lift or carry up to ten pounds were supported by the objective medical evidence. Record at 74. The ALJ further determined that Dr. Elmes' conclusions regarding Ms. Hughes' sit/stand/walk restrictions were not supported by objective medical evidence and were instead based exclusively on Ms. Hughes' subjective complaints. Record at 74. The ALJ also

rejected Dr. Elmes' "no more than occasional overhead reaching" restriction; he determined that Ms. Hughes' sporadic treatment and lack of proscribed medication undermined the doctor's conclusion. Record at 75. The ALJ also concluded that there was no other credible evidence to support Dr. Elmes' postural and environmental limitations, with the exception of the limitation regarding exposure to lung irritants. Record at 75.

At step five, the ALJ determined that Ms. Hughes was capable of performing past relevant work as a clerical worker. Record at 75. The ALJ found that this work did not require the performance of work related activities precluded by plaintiff's RFC. Record at 75. In support, the ALJ referenced the work history report dated March 9, 2007. Record at 75. In this report, Ms. Hughes provided that she previously worked as a night audit worker at a hotel and as a clerical worker earning between $6.50 and $12.50 an hour. Record at 75. The ALJ noted that Ms. Hughes was required to use special skills on the job, and she lifted up to ten pounds and less than ten pounds frequently. Record at 75. In addition, Ms. Hughes was required to stand for one hour, sit for five hours, walk for one hour and stoop for one hour in an eight hour work day. Record at 75. The ALJ determined that the demands of Ms. Hughes' past relevant work did not exceed her residual functional capacity. Record at 75.

## Social Security Regulations

When an individual claims a need for DIB or SSI, she must prove the existence of a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the Social Security Regulations require a sequential five-step analysis. First, the ALJ must determine if Ms. Hughes is currently employed; second, a determination must be made as to whether Ms. Hughes has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine Ms. Hughes' residual functional capacity ("RFC"); and fifth, the ALJ must decide whether Ms. Hughes is capable of performing work in the national economy. *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, Ms. Hughes bears the burden of proof; at step five, the burden shifts to the Commissioner.

## Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is ''more than a mere scintilla''; rather, it is ''such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion.'' *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not ''displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'' *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the court may afford a claimant meaningful review of the SSA's ultimate findings. *Steele,* 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

### Discussion

Ms. Hughes argues that the ALJ's decision – which ultimately became the Commissioner's decision – should be reversed or remanded for three reasons. First, she argues that the ALJ

failed to make a proper credibility determination, contrary to SSR-96-7p. She claims that the ALJ weighed the credibility of her testimony incorrectly based on his own unsubstantiated analysis of her RFC, and therefore the ALJ's analysis of her credibility is merely conclusory. Second, Ms. Hughes argues that the ALJ erred in failing to properly determine her RFC; she claims that the ALJ had no medical basis for the RFC, and that he instead relied on his own independent medical determination. Third, Ms. Hughes argues that the ALJ failed to analyze the specific requirements of her past relevant work, contrary to SSR 82-62, and he failed to call a vocational expert to testify to those specific duties.

A.    The ALJ's Assessment of Ms. Hughes' Credibility

Ms. Hughes argues first that the ALJ erred by failing to analyze her credibility consistent with SSR 96-7p, and she cites *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003), to support her argument. Essentially, Ms. Hughes asserts two main arguments regarding credibility. First, she argues that the ALJ did not support his finding that she was not credible with articulated reasoning based on evidence in the record, as required by 20 CFR 404.1529(c)(4) and SSR 96-7. Second, Ms. Hughes argues that the ALJ's analysis of her credibility was flawed because it was based

on his own interpretation of Ms. Hughes' RFC, weighed against her testimony and the evidence.

The ALJ's credibility determination is reviewed with deference. *Allen v. Astrue*, 721 F.Supp.2d 769, 782 (N.D. Ill. 2010) (citing *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008)). An ALJ's credibility determination must contain specific reasons for his finding. *Steele v. Barnhart,* 290 F.3d 936,942 (7th Cir. 2002). An ALJ is required to carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony regarding it. *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). When assessing a claimant's credibility, the ALJ does not need to rely on a citation of the claimant's subjective complaints where it is not supported by the objective evidence. *Allen*, 721 F.Supp 2d at 782 (citing *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir.2004)). Instead, the ALJ should consider factors such as the objective medical evidence, daily activities, allegations of pain, aggravating factors, types of treatment received and medications taken, and functional limitations to determine her credibility. *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009).

The ALJ determined that Ms. Hughes' "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Record at 70. In making this finding, the ALJ analyzed each of Ms. Hughes' claimed impairments and considered her claimed symptoms and her claims regarding the limiting effects thereof; he also considered the lack of a longitudinal medical record, the objective medical records, the medical opinion evidence, the types of treatment received and medications taken, her testimony concerning what she did in an average day, and her functional limitations. Record at 63-75. After weighing all of this evidence, the ALJ found that Ms. Hughes' testimony was not fully credible, Record at 68-75; this finding is supported by substantial evidence in the record.

Ms. Hughes bases her second argument on *Brindisi v. Barnhart,* 315 F.3d 783 (7th Cir. 2004). In *Brindisi,* the ALJ's credibility determination was conclusory and based solely on his RFC determination. *Id.* But that case is distinguishable; in *Brindisi* the credibility determination was problematic because the ALJ failed to explain the weight given to the claimant's statements and failed to support his determination with evidence in the record. *Id.* at 788. In this case, as detailed below, the ALJ engaged in a detailed assessment of each of Ms. Hughes'

impairments, weighing her testimony and written statements, against the objective and subjective medical evidence.

First, the ALJ determined Ms. Hughes' statements, regarding her inability to work partly due to her hearing loss, were not credible. Record at 48-49, 71. In his opinion, the ALJ noted that, on October 12, 1992, Ms. Hughes had an audiological exam and was diagnosed with hearing loss. Record at 71, 242-44. There is no evidence or testimony that she received treatment for this condition. Record at 71, 242-44. The ALJ also referenced Ms. Hughes' work history report, which demonstrated that she worked up until August 28, 2006, the alleged onset date. Record at 71, 242-44. The ALJ noted that Ms. Hughes had another audiological exam after treatment recommenced in 2007. Record at 71. The ALJ correctly interpreted the audiological exams when he concluded that Ms. Hughes' hearing actually improved between 1992 and 2007. Record at 71, 242-43, 434, 467. Ms. Hughes' credibility is suspect in relation to her statements regarding her hearing impairment because her onset date is inconsistent with the objective medical records and her work history. When determining the onset date of a disability an ALJ must apply the framework outlined in SSR 83-20:

> In the case of slowly progressive impairments, SSR 83-
> 20 does not require an impairment to have reached the
> severity of an impairment listed in the regulations,

33

but "[t]he onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA for a continuous period of at least 12 months or result in death.

SSR 83-20 § 3; see *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); 20 C.F.R. § 404.1529(c)(2). In Ms. Hughes' case, the ALJ correctly determined that there was not sufficient evidence to support that Ms. Hughes' hearing impairment was sufficiently severe enough at the time of the onset date to constitute a disability.

Second, the ALJ reviewed Ms. Hughes' credibility in relation to her diagnosed shoulder issues. Record at 71-72. There is substantial evidence to support the ALJ's finding that Ms. Hughes' subjective complaints regarding her bilateral adhesive capsulitis were inconsistent with the medical evidence of record and with her work history. The ALJ noted that Ms. Hughes testified that she was originally diagnosed with bilateral adhesive capsulitis in 2002. Record at 388. She also testified to undergoing four months of physical therapy and two to three years of an at home exercise program after her physical therapy sessions ceased in 2003. Record at 27. Ms. Hughes testified that she continued to work after her 2002 diagnosis of bilateral adhesive capsulitis. Record at 27. She also testified that her range of motion had improved since her original diagnosis, but

that her strength had not returned. Record at 27. The ALJ additionally noted that Ms. Hughes testified that she would be unable to sit at a desk and perform desk work, because she would experience muscle spasms as a symptom of her bilateral adhesive capsulitis. Record at 36, 71. The ALJ did not find Ms. Hughes' statements credible regarding her symptoms of this condition, in part, because she was able to work between when she was originally diagnosed in 2002 and the time of the alleged onset on August 28, 2006. Record at 71, 182, 388. The ALJ further analyzed all of Ms. Hughes' medical records in relation to her shoulder impairments after treatment recommenced in 2007. Record at 72. The internal medicine consultative exam in 2007 and the orthopedic consultative exam in 2009 both indicated that Ms. Hughes had nearly full range of motion in her shoulders, with no pain and intact strength in her upper extremities. Record at 72, 405, 410, 436-50. The ALJ noted Ms. Hughes' testimony regarding her daily activities in addition to the medical evidence of record. Record at 72. Ms. Hughes testified that she was able to perform modified household chores like laundry, taking out garbage, and taking public transportation to do her own grocery shopping. Record at 47, 72. She testified to carrying a bag of groceries weighing between eight and ten pounds on the bus from the grocery store. Record at 47. The ALJ correctly determined

that Ms. Hughes' daily activities were inconsistent with her claimed symptoms. Record at 72-73. Ms. Hughes' statements regarding her inability to sit at a desk and her testimony about her daily activities are undermined by the fact that she actually performed clerical work between 2002 and 2006. Record at 35, 36, 72-73. There is, in short, substantial evidence to support the ALJ's findings concerning the credibility of statements Ms. Hughes made regarding her shoulder impairment.

Third, the ALJ considered Ms. Hughes' credibility in relation to her COPD or bronchiectasis symptoms. Record at 73-74. He correctly ruled that Ms. Hughes had COPD, but he found that the evidence of record did not support her claims concerning the intensity, persistence and limiting effects of her symptoms, partially because she worked from the time of original diagnosis until the alleged onset date. Record at 73-74. The ALJ cited substantial evidence supporting his determination that Ms. Hughes' testimony regarding her COPD symptoms was not credible. Record at 73-74. For example, she claimed that she was unable to work, in part, because of her bronchiectasis; yet she worked, seemingly without complaint or incident, for four years after that condition was diagnosed. Ms. Hughes' first pulmonary function test and bronchitis diagnosis was in 2002. Record at 235, 365, 378. Ms. Hughes worked from her first complaints of

pulmonary problems until the alleged onset date in August 2006. Record at 182. After treatment recommenced in 2007, the ALJ noted that the medical records from May 2007, January 2008, and May 2008 all stated that Ms. Hughes had clear lungs. Record at 73. The ALJ also noted that Ms. Hughes was diagnosed with mild bronchiectasis on May 27, 2008, and the physician's notes indicated that Ms. Hughes was asymptomatic, with no treatment other than over the counter nasal spray. Record at 74, 487. The ALJ also noted that Dr. Cohen, the pulmonary specialist at Stroger Hospital, characterized Ms. Hughes' bronchiectasis as mild. Record at 484-87. Dr. Cohen also reported that Ms. Hughes had a very difficult time dealing with the diagnosis. Record at 487. The ALJ considered Ms. Hughes' COPD diagnosis when he crafted her RFC, and he noted that she should avoid excessive exposure to lung irritants. The ALJ's credibility determination regarding Ms. Hughes' COPD symptoms was supported by substantial objective medical evidence.

The ALJ considered many relevant factors in determining Ms. Hughes' credibility regarding her symptoms. However, the ALJ did incorrectly weigh two factors in his credibility assessment: the lack of a longitudinal medical record and Ms. Hughes' smoking. Record at 73. Nonetheless, his determination regarding Ms. Hughes' credibility survives these defects because neither of

these factors constitute reversible error. The ALJ noted that there was a gap in treatment, or a lack of a longitudinal medical record, between January 2007, when physical therapy ended, and August 2007, when Ms. Hughes recommenced treatment. Record at 70. The ALJ found that this factor weighed heavily against the credibility of Ms. Hughes' statements regarding the intensity, persistence and limiting effects of her conditions. Record at 70. However, Ms. Hughes testified that she did not seek medical treatment because she did not have health insurance. Record at 28, 70. SSR 96-7p provides, in pertinent part,

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. SSR 96-7p.

Lack of health insurance or an inability to afford health care are bona fide reasons for not seeking medical treatment for a condition. SSR 96-7p, *Brennan-Kenyon v. Barnhart*, 252 F. Supp.2d 681, 696 (N.D. Ill. 2003); Record at 35, 47. The ALJ incorrectly factored Ms. Hughes' failure to seek treatment in his credibility assessment, because the gap in treatment was due to the bona fide excuse of an inability to pay and lack of health insurance. An ALJ's failure to make a credibility determination in line with

38

SSR 96-7p can, in some cases, mean reversal; this is not one of those cases. Here, the ALJ relied on specific evidence, independent of the failure to seek aggressive treatment, to support his credibility determination. See *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)(requiring reversal for incorrect application of SSR 96-7p); *Spaulding v. Astrue*, 702 F.Supp.2d 983, 997 (N.D.Ill. Mar 22, 2010)(reversal not required). The ALJ also found that Ms. Hughes' smoking undermined her claim of disabling lung disease or COPD. Record at 73. *Sias v. Secretary of Health and Human Services*, 861 F.2d 475 (6th Cir. 1988). First, it is unclear whether Ms. Hughes was still smoking during the relevant time period. Her medical records from 2002 and 2003 indicated that she smoked four packs a year, but that she quit in 1978. Record at 327. On November 14, 2007, when Ms. Hughes visited Stroger Hospital, her patient notes indicated that she was a smoker. Record at 415. Her pulmonary follow up report from 2008 indicated "remote" tobacco use. Record at 419. The ALJ incorrectly weighed Ms. Hughes' smoking as a factor in considering the validity of her lung impairments, because he failed to consider whether Ms. Hughes would still be disabled if she were to stop smoking. *See Rousey v. Heckler*, 771 F.2d 1065, 1069-70 (7th Cir. 1985); *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). But smoking in itself

39

is not an impairment. And it is clear that the ALJ considered
Ms. Hughes' respiratory limitations no matter the cause. He
included a restriction on exposure to lung irritants in his RFC
to accommodate her diagnosed bronchiectasis. Thus, these factors
notwithstanding, the ALJ's credibility findings are supported by
substantial other evidence in the record.

B.   The ALJ's Residual Functional Capacity Findings

Second, Ms. Hughes argues that the ALJ had no medical basis
for the RFC he constructed for her. She argues that, because of
the lack of medical basis, the ALJ's RFC consisted of independent
medical findings which are inconsistent with precedent. *Bailey
v. Barnhart*, 473 F. Supp. 2d 822, 838-39 (N.D. Ill. 1996); *Suide
v. Astrue*, 371 Fed. Appx. 684, 690 (7th Cir. 2010). RFC is
defined as the most a person can do despite her limitations. 20
C.F.R. § 404.1546(a)(1). The ALJ had the responsibility for
assessing Ms. Hughes' RFC at the hearing level. 20 C.F.R. §
404.1546(c). Ms. Hughes' argument is essentially that, because
the ALJ's RFC differs from all of the medical opinion testimony,
the ALJ had no medical basis for the RFC. *Suide*, 371 Fed. Appx.
684 at 690. However, the ALJ is not required to rely on a
particular physician's opinion or to choose between the opinions
of Ms. Hughes' physicians. *Simila v. Astrue*, 573 F.3d 503, 516
(7th Cir. 2009).

The ALJ determined that Ms. Hughes had the RFC to lift or carry up to ten pounds, sit for six hours, and stand or walk for six hours in an eight hour workday. Record at 69. He also determined that she should avoid excessive exposure to lung irritants. Record at 69. The ALJ considered the medical opinion testimony of: Dr. Villaneuva, the state agency medical consultant; Dr. Clar, Ms. Hughes' treating physician; and Dr. Elmes, the consultative orthopedic physician. Record at 74. The ALJ first analyzed the opinion of the state agency medical consultant. Record at 74. He found that Dr. Villaneuva's May 15, 2007 report that Ms. Hughes did not have a severe impairment was given reduced weight because the testimonial evidence established severe impairments but not a disability. Record at 74. This finding was in Ms. Hughes' favor and was based on testimonial evidence given at the hearing level of Ms. Hughes' diagnosis of bilateral adhesive capsulitis and COPD. Record at 74. Next the ALJ considered the opinion of Dr. Clar, the treating physician who saw Ms. Hughes on January 7, 2008. Record at 74. Dr. Clar's opinions were not considered credible because his assessment of Ms. Hughes' physical capabilities was not supported by the weight of the medical evidence and was not supported by any objective medical tests. Record at 427. Dr. Clar's report stated that Ms. Hughes was only able to lift two

and a half pounds, and that she could not do any continuous filing type work for more than ten minutes without a break; but that she was cleared to return to work immediately.  Record at 427.  The ALJ then analyzed the medical opinion testimony of Dr. Elmes, who completed the physical RFC assessment.  The ALJ determined that Dr. Elmes' opinion was given some weight, but that some of the restrictions he noted were contrary to the weight of the medical evidence and testimony.  Record at 74-75. Specifically, Dr. Elmes' lifting restriction to ten pounds was credible, but the overhead reaching restrictions, as well as the sitting, standing, and walking restrictions were not supported by the evidence.  Record at 74-75.  In these regards, the ALJ's evaluation, analysis, and explanation of his conclusions are appropriate.  Ms. Hughes' case is distinguishable from *Bailey v. Barnhart, 473 F.Supp.2d 822 (N.D.Ill. 2006)*.  *In Bailey*, the ALJ did not cite any medical evidence to support the physical RFC finding.  *Id.* at 839.  In Ms. Hughes' case, the ALJ cited extensively to the medical records to construct the RFC.  Record at 63-75.  And, contrary to Ms. Hughes' argument, the ALJ did not throw out all of the medical opinion evidence, because the ALJ gave some weight to Dr. Elmes' opinion testimony.  Record at 69-73.

C.    Ms. Hughes' Past Relevant Work

Finally, Ms. Hughes argues that the ALJ failed to analyze the specific requirements of her past relevant work, contrary to SSR 82-62. At step four, Ms. Hughes is not considered disabled if she can perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Additionally, Ms. Hughes need only be able to perform one of her past jobs to be found not disabled 20 C.F.R. § 404.1560(b). Ms. Hughes cites *Nolen* to support her position. *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991). In *Nolen*, the ALJ did not analyze the specific duties of the claimant's past work; nor did the ALJ consider whether he could perform those duties. *Id.* at 519. Instead, the ALJ simply stated that the claimant's former job was considered un-skilled at the light exertional level. *Id.* The court in *Nolen* held that, "[i]n determining that a claimant is capable of returning to past relevant work, the ALJ must discuss the specific requirements of a claimant's past work, and not just state the requirements of the past work in terms of exertional categories." *Nolen*, 939 F.2d at 518 (citing SSR 82-62).

Here, the ALJ determined that Ms. Hughes could perform her prior past relevant work as a night audit worker. Record at 75. In contrast to the ALJ in *Nolen*, however, the ALJ here named the specific job of night audit worker and did not just name a class

43

of work by exertional level. The ALJ heard testimony about the specific duties Ms. Hughes completed in her past work. Record at 17-25. She testified that, as a night audit worker, she occasionally lifted towels, bedding, full pots of coffee, and paperwork. Record at 17. She did not testify that she was exposed to excessive lung irritants in this position. Record at 13-58. Her testimonial description of the duties of the night auditor position is consistent with the Dictionary of Occupational Titles ("DOT") description. Record at 226. The DOT categorizes this position as sedentary work, which entails lifting ten pounds or less a third of the time or less. Record at 226. The ALJ did not find that Ms. Hughes could perform all sedentary jobs; he found that she could perform her previous job of night audit worker, and he solicited a great deal of testimony on what that job required. Record at 75. His findings on this issue are supported by substantial evidence.

Relatedly, Ms. Hughes argues that the ALJ erred in not calling a vocational expert ("VE") to testify. This court disagrees. A VE's testimony *may* be solicited at step four, but it is generally discretionary. 20 C.F.R. §§ 404.1566(e); 20 C.F.R. § 404.1560(b)(2); see also *Wright v. Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010). The testimony of a VE is not required at step four. *Wright*, 597 F.3d at 395.

**CONCLUSION**

For the reasons set forth above, the Court denies Ms. Hughes'
Motion for Summary Judgment [#22], and grants the Commissioner's
Cross-Motion for Summary Judgment [#33]. The decision of the
Commissioner is affirmed.

Dated: December 7, 2011

ENTER:

ARLANDER KEYS
United States Magistrate Judge